UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:06CR761 HEA |
| | ) | |
| JAY SCOTT PATTERSON, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b). The Defendant filed a Motion to Suppress Statements (Doc. #20), and a Motion to Suppress Evidence (Doc. #21). A hearing was held on the motions to suppress on May 2, 2007. In addition, after the hearing, the parties were ordered to file supplemental briefs, and the briefing was completed by May 25, 2007.

Based upon the evidence adduced at the hearing on the motions to suppress, the undersigned makes the following findings of fact and conclusions of law:

**Findings of Fact**

Darryl Balleydier is a detective with the Franklin County Drug Task Force. In August, 2006, and in the months immediately prior to that time, detectives of the Task Force received information from two different sources that the Defendant was involved in the manufacture and use of methamphetamine. In order to further this investigation, on August 14, 2006, Balleydier went to the Defendant's residence at 1926 Mike Allen Drive in Washington, Missouri. He and three other detectives were present at the residence and knocked on the door of his house. The Defendant came

to the door and the detectives asked the Defendant if they could come into the house. The Defendant opened the door wide, and motioned for the officers to come into the house.

The Defendant asked one of the detectives (Det. Scott) to sit down on the couch in the living room. Scott told the Defendant that he was with the Franklin County Drug Task Force, and the detectives had received information that the Defendant might be involved in methamphetamine use and wanted to question him about that possible activity. The Defendant agreed to talk to them.

Shortly after entering the house, Balleydier smelled the odor of burned marijuana and asked Patterson if anyone else was present in the house. When Patterson said that no one else was in the house, the detectives asked the Defendant if it was okay to look around the house to make sure there were no other individuals in the residence. Patterson told the detectives that he fully understood why they would want to make sure that no one else was in the house, and that they were welcome to look around for other people. No threats or promises were made to the Defendant in order to obtain his consent to look around the house to determine if other persons were present. As Det. Balleydier was conducting the cursory sweep of the house, he observed in plain view on a sink in the bathroom a pair of hemostats with burned residue on them. On a shelf near the basement steps, he observed a can of solvent which appeared to be denatured alcohol, and also observed lithium batteries. On the floor of the basement, also in plain view, Balleydier observed the corner of a plastic baggie and a piece of tin foil with burned residue. On the bar in the basement, the detective observed a mason jar containing a liquid of unknown origin, and on the floor in this general area observed two, one-gallon cans of Coleman camp fuel or starter fluid. After observing the above items, which Balleydier knew from his experience were used in the manufacture or use of methamphetamine, he returned to the living room area and informed the Defendant what he had observed during the limited search.

2

He told the Defendant that the items appeared to be items which were involved in the manufacture or use of methamphetamine, and asked Patterson for permission to search the house. Patterson said that before deciding whether to allow the search, he wanted to first call his brother who was an ATF agent. Balleydier told the Defendant that was fine with him, and told him to go ahead and use the phone. The Defendant then retrieved his cell phone (which contained the Defendant's brother's number), and called someone and began talking to a person who he identified as his brother. After a period of conversation, Balleydier heard the person on the phone yelling at Patterson. At this point, Patterson became agitated and started talking loudly to the detectives telling them that they needed to get out of his house because they were violating his "Fourth Amendment rights." Balleydier asked the Defendant if he was refusing to grant permission to search his house, and he said that he was. Balleydier told the Defendant that that was fine and it was his decision to make, but that Balleydier and the detectives would go to the prosecutor and the court and attempt to get a warrant to search the Defendant's house. He told the Defendant that during the interim, in order to preserve the scene, the Defendant would have to wait outside while the detectives applied for a warrant. The Defendant stated that he was not going anywhere, and told the detectives that he would not leave his house, that he could not be forced to leave his house, and that they should leave his house immediately. At this point, because the Defendant continued his resistance and hostile demeanor, he was placed under arrest for possession of drug paraphernalia and handcuffed. He was placed on the front porch, and a marked unit from the Washington, Missouri police department picked him up and took him to the police station.

At this point, Balleydier went to the Franklin County Prosecutor's Office and prepared a search warrant application and affidavit in support of the application. He obtained the prosecuting

3

attorney's approval for the warrant, and the prosecutor signed the application. Balleydier then went to Judge Williams of the Franklin County Circuit Court and applied for a warrant to search the Defendant's house at 1926 Mike Allen Drive, Washington, Missouri, and to seize marijuana, methamphetamine, drug paraphernalia, clandestine laboratory equipment, chemicals and artifacts, records pertaining to drug sales and on manufacturing, computers and all computer-related equipment, discs and accessories, and firearms. The affidavit, which Balleydier swore was true and correct, stated in substance the following:

    The detectives went to the Defendant's house because they received information that the resident of the house was involved in the manufacture and distribution of methamphetamine, and the Defendant was the sole resident of the house. Balleydier recounted that he and other detectives had been allowed admission to the residence by the Defendant. Upon entering the residence, Balleydier smelled burned marijuana and asked the Defendant for permission to look around the house for other people. He stated that the Defendant gave permission to look around the house for other occupants. During this search for other occupants, Balleydier said that several items were observed in plain view. In the master bathroom lying on a sink countertop, Balleydier observed a pair of hemostats with burned residue. Further, on a shelf in the basement stairway, Balleydier located a gallon can of solvent which he believed to be denatured alcohol and with the solvent, he also observed a lithium battery. Balleydier told the judge that he is familiar with both those items, and knows that they are used in the manufacture of methamphetamine. Further, on the basement floor next to a bar, Balleydier observed a corner of a plastic bag and a piece of tin foil with burned residue. Balleydier told the judge that based on his experience, he knows that plastic bag corners are commonly cut off to package methamphetamine, and also that small pieces of tin foil are used to both store and later

4

smoke methamphetamine. Balleydier also observed on the bar in the basement, a mason jar filled with liquid which was of an unknown type. Belleydier stated that, based on his experience, he knows that in the process of manufacturing methamphetamine, chemicals are altered and processed in mason jars leaving unknown liquids. Balleydier also observed on the floor two cans of camp fuel or Coleman fuel. Balleydier also told the judge that, based on his experience, Coleman fuel is one of the necessary ingredients for the manufacture of methamphetamine. The affidavit also states that generally within Balleydier's training and experience and participation in other investigations, he knows that drug dealers normally maintain books, records, controlled substances, financial instruments, checks, and other items which are indications of drug dealing.

Based on the above affidavit, Judge Williams issued a search warrant to search 1926 Mike Allen Drive, and to seize the items requested by the warrant. The detectives then executed the warrant, seizing several firearms from a gun cabinet, including a .22 caliber Ruger pistol with a homemade silencer and other firearms and rifles; a gallon metal can fifty per cent full and plastic tubing; a hand pump with tubing; plastic bags and a plastic dish with used filters with an unknown powder in them; two one-gallon plastic jugs; two plastic jugs with used filters; the two empty cans of Coleman fuel; drug paraphernalia, including several aluminum foil packets with residue; glass jars with unknown residue; a glass pipe with burned residue; hemostats with burned residue; plastic corners of bags with powder residue, and a metal container with a powder residue. After completing the execution of the search warrant, the detectives left the house.

The Defendant's brother and brother's fiancé, Michelle Gill, also testified at the hearing. The Defendant's brother is an arson investigator employed by the Fire Marshals Office in the City of Mission, Texas, and is a certified peace officer. The brother's fiancé is a detention officer employed

by the United States Marshals Service for the Southern District of Texas. Both testified in substance that on August 14, 2007, the Defendant's brother received a cell phone call from the Defendant. The Defendant appeared to be very excited and was speaking loudly. The Defendant told his brother that cops were in the house and would not get out even though they were not invited. His brother asked the Defendant if the police had a warrant, and the Defendant said that they did not. According to Gill, the brother, at that point, told the Defendant to tell the police officers to "get the fuck out of the house. They have no right to be there." The brother also told the Defendant to tell the police officers that he worked with the ATF Task Force in Texas, and if they did not have a consent or a warrant, they were acting illegally and needed to leave. At this point, the Defendant's brother testified that he distinctly heard one of the people in the house state, "Well I've also worked with federal task forces and we can do what the fuck we want." The Defendant's brother testified that he stayed on the phone with the Defendant for fifteen minutes, however, this is the only statement that he heard any of the officers make, although he heard mumbling in the background. In contrast, both Det. Balleydier and Det. Scott testified unequivocally that the Defendant gave them permission to come into the house and gave them permission to search the house for other occupants. They also testified that they allowed the Defendant to retrieve his cell phone, and to call his brother and to talk to his brother for a lengthy period of time. Other than the brother's testimony that the Defendant told him that the officers were in the house without lawful authority, no one other than the officers testified from firsthand knowledge as to what actually occurred in the residence. Obviously, the Defendant's brother is only aware of what his brother told him happened as far as consent is concerned because the brother (unlike Det. Balleydier and Scott) was not at the house and was not a witness to anything that occurred. Given the above and given the fact the officers' testimony is uncontradicted by anyone

6

who was a firsthand witness to whether or not the Defendant initially gave the detectives consent, the undersigned accepts the testimony of the police officers that they were on the premises with the Defendant's consent and obtained his consent to make a limited search of the house. The undersigned also observed the demeanor of both Det. Balleydier and Det. Scott, and they appeared to be forthright and honest witnesses who answered questions directly both on examination of the Government's attorney and the Defendant's attorney. The undersigned concludes that they were credible witnesses. In addition, it is also uncontradicted that the agents allowed the Defendant per his request to call his brother and to talk to him for a lengthy period of time, and they obtained a search warrant signed by an impartial judge prior to searching the premises. In short, no matter what the Defendant's brother overheard, the evidence shows that the detectives did not do "whatever they wanted."

**Conclusions of Law**

A. Consent to Enter the Premises and Make a Limited Search

Based on the above findings, the undersigned concludes that the Defendant invited the detectives into his house, and that Defendant's consent to allow the detectives to search the house on a limited basis was lawful. In United States v. Turbyfill, 525 F.2d 57 (8th Cir. 1975), a Kansas City police officer and a Secret Service agent went to the defendant's house to investigate a counterfeiting matter. They rang the doorbell and an individual answered the door. The officers identified themselves, and the defendant opened the inside door a few feet and stepped back. After the defendant did this, the officers opened an unlocked screen door and entered the house. After entering the house, they immediately smelled a strong odor of marijuana and observed other marijuana in the room. Eventually, the officers arrested both individuals in the house and charged them with

possession of marijuana with intent to distribute the marijuana. In upholding the entry into the premises and a later seizure of the marijuana as lawful, the court stated as follows:

> Turbyfill says, however, that even if Church had authority to permit others to enter the dwelling, nothing done by Church was an invitation to the officers to enter the house and thus be in a position to see the marihuana which was first observed. An invitation or consent to enter a house may be implied as well as expressed. There was no error in the determination of the district court that the action of Church in the opening of the door and stepping back constituted an implied invitation to enter. The entry of the officers was lawful. Once in the house they were justified in seizing the marihuana which was in plain view in the shoe box on the table.

525 F.2d 57, 59 (8th Cir. 1975).

In United States v. Curnett, 123 Fed.Appx. 733 (8th Cir. 2005), the court was again faced with a situation where a police officer went to the door and told the defendant that he had to talk to the defendant. The defendant stood aside as if to allow the agent to enter, and the agent did enter the house. In upholding this procedure as lawful, the court stated as follows:

> Finally, Curnett argues that the district court made an error in law in finding that Curnett's act of stepping aside to let Chief Poletis into the home constituted an implied consent to the entry. We disagree. We have held that nearly identical actions constitute implied consent to entry. . .see also United States v. Smith, 973 F.2d 1374, 1376 (8th Cir. 1992) (finding consent by a resident who stepped aside, motioned officers in, even though the officers had previously drawn their weapons.) Because Curnett's actions were sufficient to allow a reasonable officer to infer consent to enter, we find the entry was lawful. Consequently, the evidence seized from Curnett's home was not the fruit of an unlawful search.

123 Fed.Appx. 733, 735.

Given the above, the undersigned concludes that the entry onto the premises was lawful. In the case now at bar, the detectives knocked on the door, and when the Defendant answered the door, the detectives asked the Defendant if they could come into the house. The Defendant opened the door wide, and motioned the officers to come into the house. As soon as they were in the house, the Defendant asked one of the detectives if he wished to sit on the couch in the living room. Therefore,

the undersigned concludes as in Turbyfill and Curnett, supra, the Defendant opening the door wide and motioning the agents to come into the house was both an implied and actual invitation for them to enter. Therefore, their entry was lawful.

As to the limited consent to look around the house for other individuals, the undersigned concludes that the consent to search the house for this purpose was lawfully obtained. A search based on consent is lawful if it was voluntarily given. To determine whether or not a consent to search is voluntary, the totality of the circumstances surrounding the consent must be examined. Schneckloth v. Bustamonte, 412 U.S. 218 (1983); United States v. Matlock, 415 U.S. 164 (1974). Among the factors used to determine whether consent is voluntary include: the degree to which the defendant cooperated with police; whether the defendant had been threatened in any way or promised anything; use or lack thereof of coercive police behavior to obtain consents, and the length of any detention of the defendant and nature of the questioning. See Schneckloth v. Bustamonte, supra; United States v. Matlock, supra. Applying the above law to the present case, the undersigned concludes that the Defendant was not threatened in any way to obtain his consent, nor was he promised anything. Further, prior to the consent being given, the conversation between the officers and the Defendant was quite cordial, and the Defendant evidenced a cooperative attitude with them. He told the officers that he fully understood why they would want to make sure that no one else was in the house, and that they were welcome to look around for any other individuals. Therefore, based on the above, the undersigned concludes that the consent to search the house for other individuals was lawful. During this consent search, Det. Balleydier observed in plain view items which he believed were items used to manufacture methamphetamine. These items were observed in plain view while Det. Balleydier was in the process of looking for other individuals on the premises. Therefore,

knowledge of these items was lawfully obtained. See Coolidge v. New Hampshire, 403 U.S. 443 (1971).

B.  Defendant's Statements Prior to His Arrest

Based on the above findings, the undersigned concludes that the statements that the Defendant made prior to the Defendant's arrest were non-custodial statements.  In determining whether the Defendant was in custody, the court must consider whether under the totality of the circumstances, the officers deprived the Defendant of his freedom of action in a significant way, and if a reasonable person under similar circumstances would believe that he was under arrest.  See Berkemer v. McCarty, 468 U.S. 420 (1984).

In United States v. Sutera, 933 F.2d 641 (8th Cir. 1991), FBI agents executed a search warrant on the defendant's apartment, defendant's car, and on defendant's person, thoroughly searched the defendant's person and frisked him for weapons.  His movement was also restricted in his apartment in that he could not go into areas that were being searched, and was accompanied by agents.  He was further accompanied to a second location by agents to obtain documents.  In stating that the defendant was not in custody, the court stated as follows:

> It is also relevant that Sutera was "on his own turf."  Except for the brief period when Sutera and Burns drove to get the address book, Sutera was interviewed in the apartment that he was occupying.  While a person may be deemed to be in custody even in his own home, it is not the type of coercive setting normally associated with custodial interrogation.

United States v. Sutera, 933 F.2d 641, 647 (8th Cir. 1991).

In United States v. Axsom, 289 F.3d 496 (8th Cir. 2002), nine FBI agents executed a search warrant at the defendant's house at 6:45 a.m.  The defendant answered the door wearing only a towel and the nine agents immediately entered the house.  As soon as they entered the house, they observed

several firearms hanging on the walls of the premises, and at least three Samurai swords also in plain view. They first proceeded to secure the weapons. Next, the agents escorted the defendant to his bedroom where he was allowed to dress, and taken to the living room where he was told to sit down on the couch. Two agents then interviewed the defendant for about an hour. When the defendant got up as if to get a drink of water, the agents did not allow him to get a drink, and instead told him that they would get the water for him. When the defendant wanted to go to the bathroom, he was escorted by an agent to the bathroom and not allowed to go alone. In stating the test to be followed in determining whether the defendant was in custody, the court stated:

> Custody occurs when a suspect is deprived of his freedom of action in any significant manner. . .In deciding whether a person was "in custody," we must examine both the presence and extent of physical and psychological restraints placed upon the person's liberty during interrogation "in light of whether a 'reasonable person in the suspect's position would have understood his situation' to be one of custody." . . . Thus, if Axsom believed his freedom of action had been restrained to a "degree associated with formal arrest" and his "belief was reasonable from an objective viewpoint," then Axsom was "held in custody during the interrogation."

289 F.3d 496, 500. In determining that the defendant was not in custody because of a police dominated atmosphere with the nine agents being in the house, the court stated that this was mitigated by the fact that only two agents were involved in the interview while the rest searched the premises. They further held that the fact that the defendant's movements were restricted during his interview was not enough to show that he was "in custody." In so holding, the court stated as follows:

> While nine persons participated in the execution of the search warrant, only two agents conducted the interview. . .Photographs of Axsom and federal agents taken at or near the time of the questioning reflect a more casual scene than a police dominated, inherently coercive interrogation. When a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial.

11

289 F.3d 496, 502. As to the fact that Axsom's freedom of action was limited, the court stated as follows in holding that the defendant was not in custody:

> Although the evidence exists to support the district court's finding that the agents restrained Axsom's freedom of action, his freedom was not restrained to a degree associated with formal arrest. California v. Beheler, 463 U.S. 1121, 1125 (1983). Axsom was not handcuffed nor was he confined to one room.

Axsom, 289 F.3d 496, 502. See also United States v. Galceran, 301 F.3d 927 (8th Cir. 2002).

Based on the above law, as stated, the undersigned concludes that the Defendant was not in custody until he was formally arrested and placed in handcuffs. As in Sutera, supra, the Defendant was in his own home and seated on his couch in his living room talking to the detectives. They neither threatened him nor promised him anything in return for talking to them. He freely agreed to talk to them. In addition, when the Defendant asked if he could call his brother to ask the brother's advice on whether he should consent to a full search of the house, the detectives allowed him to make that phone call, and he stayed on the phone with his brother for an extended period of time. There is no evidence that the detectives told him to hang up or cut his conversation short. When the Defendant refused to consent to the search of the house, the detectives told him that it was his right, but that he would have to wait outside of the house while they obtained a search warrant. It was only after the Defendant refused to move outside of the house while the premises remained in tact and a warrant was applied for, that the Defendant was arrested for possession of drug paraphernalia. Thus, the undersigned concludes that as in Sutera and Axsom, above, the Defendant was not in custody in this matter, and his movement was not restricted in any significant way consistent with formal arrest until he refused to leave his house and he was handcuffed. Therefore, the undersigned concludes that the Defendant could not reasonably believe that he was in custody while standing in his living room

12

and talking to his brother on the phone. Therefore, the Defendant's statements prior to his arrest should not be suppressed.

### C. Search Warrant for 1926 Mike Allen Drive

Based on the above findings, the undersigned concludes that sufficient probable causes exists to authorize the issuance of the search warrant for 1926 Mike Allen Drive in Washington, Missouri. For a search warrant to be valid, it must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities, or fruits of a crime or contraband may be found in the place to be searched. Johnson v. United States, 333 U.S. 10 (1948); Warden v. Hayden, 387 U.S. 294 (1967). The quantum of evidence needed to meet this probable cause standard has been addressed by the Supreme Court on numerous occasions:

> In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

Brinegar v. United States, 338 U.S. 160, 175 (1949). Probable cause is a "fluid concept turning on the assessment of probabilities in particular factual context–not readily or even usefully reduced to a neat set of legal rules." See Illinois v. Gates, 462 U.S. 213, 232 (1983). Further, probable cause in an affidavit "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." Illinois v. Gates, at 232. Probable cause may be based on the totality of the circumstances present. All that need be shown for probable cause to search is that there is a "fair probability" that contraband or evidence of a crime will be found at the premises to be searched. See Illinois v. Gates, supra. Information from a reliable informant, without more, may provide probable cause for the issuance of a search warrant. See United States v. Pressley, 978 F.2d 1026 (8th Cir. 1982). In addition, even an anonymous tip from a crime stoppers

hotline or an informant whose reliability has not been tested is a sufficient basis upon which to create probable cause as long as there is adequate corroboration of even innocent details. See United States v. Briley, 726 F.2d 1301 (8th Cir. 1984).

Given the above law, the undersigned concludes that there was adequate probable cause stated in the affidavit for the issuance of the warrant. Initially, the detectives received information that the Defendant was involved in manufacturing or distributing methamphetamine. When they went to the residence and entered it, the detectives immediately detected the odor of burned marijuana. While looking around the home with the consent of the Defendant, the detectives observed in plain view hemostats with burned residue, tin foil with burned residue, plastic bag corners which had been cut off, mason jars with odd colored liquids, Coleman fuel or camp fuel, a lithium battery, and a can which stated that it contained denatured alcohol.

The detective, who was an experienced drug and methamphetamine investigator, explained to the judge that the tin foil packets were used to first store and later consume methamphetamine, and that plastic bag corners were cut off to package methamphetamine. As to the mason jars with unknown liquid, the detective explained to the judge that in the process of manufacturing methamphetaine, chemicals are altered and processed in mason jars leaving unknown liquids. The detective also explained to the judge that denatured alcohol, camp fuel, and lithium batteries are necessary ingredients in the manufacture of methamphetamine. The undersigned concludes that the general information that the Defendant was involved in the manufacture and sale of methamphetamine, along with the detective's observation of tin foil with burned residue, plastic bag corners, a lithium battery, mason jars with unknown liquid, a can of denatured alcohol, and camp fuel (all of which are necessary ingredients for the manufacture of methamphetamine) leads the

undersigned to conclude that there is at least a "fair probability" that evidence of manufacture or use of methamphetamine or other drugs would be found in the Defendant's home. This "fair probability" becomes even stronger when the smell of burned marijuana and the hemostats with burned residue are added to the probable cause. See United States v. Briley, supra; Illinois v. Gates, supra.

In addition, the warrant was executed in a lawful manner. "A lawful search extends to all areas and containers in which the object of a search may be found." United States v. Weinbender, 109 F.3d 1327, 1329 (8th Cir. 1997). In this case, any items which the agents observed when looking for marijuana, methamphetamine, or any utensils to make those items, could be seized as long as it was observed during the search and its unlawful character was apparent. See Coolidge v. New Hampshire, supra. This obviously applies to the handgun and the silencer since the weapon itself is illegal and is contraband.

In the alternative, the evidence seized during the search warrant should not be excluded even if there was not probable cause for the issuance of the warrant if the officers executed the warrant with objectively reasonable, good faith reliance on the judicial officer's determination of probable cause. See United States v. Leon, 486 U.S. 897, 920-22 (1984). Certainly in this matter, the officers had a good faith belief that probable cause existed and were acting on a good faith reliance on the judge's determination of probable cause.[1]

---

[1] The Defendant claims that the good faith exception can not be considered because the affidavit contains intentionally false or recklessly false statements. In this regard, the Supreme Court has held that the good faith exception does not extend to warrants issued in reliance on intentionally, deliberately, or recklessly false affidavits. See United States v. Leon, supra. In formulating the standard to be used in this circuit for determining intentionally false statements, the Eighth Circuit Court of Appeals has stated as follows:

> To succeed in a Franks type challenge of the validity of a search warrant, a Defendant must establish by a preponderance of the evidence that the affiant either intentionally

15

**Conclusion**

Therefore, based on the above, the undersigned concludes that the Defendant's motion to suppress evidence and motion to suppress statements should be denied.

∗ ∗ ∗

---

or with reckless disregard for the truth included a false statement within a search warrant affidavit.

United States v. Clapp, 46 F.3d 795, 799 (8th Cir. 1995). For an affidavit to be truthful does not mean "truthful in a sense that every fact recited in the warrant is correct." Clapp, supra at 799. This is so because "affidavits are often drafted by non-lawyers in the midst and haste of a criminal investigation." In order to determine whether or not a false statement in an affidavit was intentional or reckless, the Defendant must show that "the affiant in fact entertained serious doubts as to the truth of the affidavit or had reason to doubt the accuracy of the information contained therein." United States v. Clapp, 46 F.3d 795, 801. In Clapp, supra, the court held that two statements in the affidavit were misleading, inappropriate and inaccurate, but nevertheless were not intentional or reckless, and therefore did not rise to intentional deletion or inclusion of false material facts in an affidavit. Given the above, the undersigned concludes that there were no intentionally or recklessly false statements made in the affidavit. The Defendant states that no plastic bag corners were found during the search of the house and, thus, the detective intentionally made a false statement in saying in the affidavit that he observed baggie corners. However, item "G" of the inventory states that "plastic bag with corner missing" and aluminum foil with burned residue were found during the search. Further, item "E" of the inventory states that "plastic corner bags with powder residue" were found during the search. The Defendant also states that because the detective stated he smelled burned marijuana and no marijuana was found during the search of the house, this shows that the detective intentionally falsely stated that he smelled burned marijuana. However, there is nothing to contradict that the detective smelled burned marijuana, and the undersigned concludes that there could be innocent reasons for this, including that the marijuana was being smoked using the hemostats with burned residue and then flushed down the toilet. At any rate, the undersigned concludes that there is no indication that the statement was intentionally or knowingly false or that the detective had any serious doubts about its truth or had any reason to doubt the accuracy of what he stated. See United States v. Clapp, supra.

Further, the hemostats with burned residue were found on the sink in the bathroom nowhere near any fishing equipment which was eventually observed by the detective during the execution of the search warrant. Under these circumstances, the undersigned concludes the failure to include Defendant's statement that he used the hemostats with burned residue to fix lures does not show that the statement in the affidavit that the hemostats with burned residue were found in the bathroom was a knowingly false or reckless statement.

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Motion to Suppress Statements (Doc. #20), and Motion to Suppress Evidence (Doc. #21) be **denied**.

Further, the parties are advised that they have until **July 9, 2007**, in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

Finally, the trial of this matter is set on **Tuesday, September 4, 2007** at **9:30 a.m.** before the Honorable Henry E. Autrey, United States District Judge, Courtroom 10-North.

   /s/ Terry I. Adelman   <br>
UNITED STATES MAGISTRATE JUDGE

Dated this  26th  day of June, 2007.